IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 13-cv-00067-CMA-BNB

CHRISTY CALVIN, individually,

Plaintiff,

v.

SMG, a Pennsylvania corporation,

Defendant.

---

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Pending is the defendant's **Motion to Dismiss Amended Complaint and Jury Demand**
[Doc. # 15, filed 3/20/2013] (the "Motion to Dismiss").  I respectfully RECOMMEND that the
Motion to Dismiss be GRANTED.

### I.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), as here, asserts that the
complaint fails to state a claim upon which relief can be granted.  "A complaint must be
dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if it does not plead 'enough facts to state a claim
to relief that is plausible on its face.'" Cutter v. RailAmerica, Inc., 2008 WL 163016 *2 (D.
Colo. Jan. 15, 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).
"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual
allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires
more than labels and conclusions, and a formulaic recitation of the elements of a cause of action
will not do." Twombly, 550 U.S. at 555 (internal citations omitted).  "Factual allegations must

be enough to raise a right to relief above the speculative level." Id.  "[A] plaintiff must 'nudge []

[his] claims across the line from conceivable to plausible' in order to survive a motion to

dismiss.  Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of

facts in support of the pleaded claims is insufficient; the complaint must give the court reason to

believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these*

claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)

(quoting Twombly, 550 U.S. 544).

"[P]lausibility refers 'to the scope of the allegations in a complaint: if they are so general

that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[] 'ha[s] not

nudged [his] claim[] across the line from conceivable to plausible.'" Khalik v. United Air Lines,

671 F.3d 1188, 1191 (10th Cir. 2012).  "The nature and specificity of the allegations required to

state a plausible claim will vary based on context." Id. (quoting Kansas Penn Gaming, LLC v.

Collins, 656 F.3d 1210, 1215 (10th Cir. 2011)).  "[T]he Twombly/Iqbal standard is 'a wide

middle ground between heightened fact pleading, which is expressly rejected, and allowing

complaints that are no more than labels and conclusions or a formulaic recitation of the elements

of a cause of action, which the Court stated will not do.'" Id. (quoting Robbins v. Oklahoma, 519

F.3d 1242, 1247 (10th Cir. 2008)).

For purposes of a motion under Rule 12(b)(6), the court must accept all well-pleaded

factual allegations as true and resolve all reasonable inferences in the plaintiff's favor.  Morse v.

Regents of the Univ. of Colo., 154 F.3d 1124, 1126-27 (10th Cir. 1998).  However, "when legal

conclusions are involved in the complaint 'the tenet that a court must accept as true all of the

allegations . . . is inapplicable to [those] conclusions' . . . ." Khalik, 671 F.3d at 1190 (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Id. at 1191.

II.

The plaintiff "is an African American female" and "a devout practicing Christian." Amended Complaint [Doc. # 13] at ¶7. She formerly was employed by defendant SMG, initially as an event manager and subsequently as a senior event manager. Id. at ¶8. She brings suit against her former employer alleging three claims: (1) race discrimination under 42 U.S.C. § 1981, id. at First Claim for Relief; (2) disparate treatment and hostile work environment based on race and religion in violation of Title VII, id. at Second Claim for Relief; and (3) wrongful/constructive discharge, id. at Third Claim for Relief.

The Amended Complaint is filled with conclusions unsupported by any factual allegations--e.g., the plaintiff "was consistently admired for her attention to detail, customer service, and ability to stay ahead of schedule," id. at ¶10; she was "looked down upon . . . for practicing Christianity," id. at ¶12; describing conduct as "conveying to Plaintiff" a certain conclusion and describing comments as having been made "in the spirit of . . . disdain for a professional African American woman," id.; the plaintiff "suddenly realized that's [sic] she was being set up to fail . . . this was a witch hunt," id. at ¶22; stating that disclosure of the plaintiff's unspecified "medical condition . . . made the clients not want to work with the Plaintiff . . . which put Plaintiff's job in jeopardy," id. at ¶22; the plaintiff's supervisor "fueled the client's unhappiness and used the opportunity to force Plaintiff to terminate her employment," id. at ¶33; the plaintiff's supervisor "spread . . . false information to Plaintiff's co-workers," id.; and

"Plaintiff's health began to fail due to stress," id. at ¶30.

Stripping away most of the unsupported conclusions, the Amended Complaint contains the following material factual allegations concerning discrimination based on religion:

(1)     The plaintiff began her employment at SMG as an event manager in May 2005 and was promoted to senior event manager in February 2009.  Amended Complaint [Doc. # 13] at ¶8.  Throughout her employment, her supervisor was Deborah Welsh.  Id. at ¶9.

(2)     As a devout Christian, the plaintiff regularly attends religious services.  Her religious beliefs notwithstanding, the plaintiff "understood and accepted that, based on her responsibilities in her position, there were going to be many weekends, including Sundays that she would have to work.  Plaintiff simply requested that when it was possible that she have Sundays or Wednesdays off."  Id. at ¶11.  Ms. Welsh "occasionally allowed Plaintiff to be off on Sundays or Wednesdays. . . ."  Id. at ¶12.

(3)     "On one occasion," when the plaintiff asked for a particular Sunday off, Ms. Welsh "snapped" at the plaintiff and "stated she had made it a point to give her [the plaintiff] a fair amount of Sundays off already. . . ."  Id. at ¶13.  The plaintiff does not allege whether she was allowed to take the particular Sunday off.

(4)     "On a separate occasion" Ms. Welsh instructed the plaintiff to put a particular high-profile client "on a pedestal."  Id. at ¶14.  The plaintiff "was uncomfortable with Ms. Welsh's instruction and clarified that she would ensure that the client received exceptional service, but that she did not put anyone but God on a pedestal."  Id.  Another event manager later reported that Ms. Welsh had "shared that discussion with her, mocking her [the plaintiff's] religious beliefs" and indicating that Ms. Welsh "did not like the fact that Plaintiff practiced her

4

religious beliefs." <u>Id</u>. at ¶15.

The factual allegations contained in the Amended Complaint concerning discrimination based on race are as follows:

(5)     "First and foremost, early in her [the plaintiff's] employment Ms. Welsh bluntly questioned Plaintiff about her ethnicity.  Plaintiff was taken aback by Ms. Welsh's direct questioning but since she was new to the company, she answered Ms. Welsh's questions." <u>Id</u>. at ¶17.  The specific questions, or even their general nature, are not specified in the Amended Complaint.

(6)     "Plaintiff explained that she was African American and that her mother was mixed with African American, English and Spanish ancestry.  From that point forward, Ms. Welsh assigned most if not all the African American and Latino/a events to the Plaintiff. Historically, these events were less desirable because the customers were widely known as very difficult and unfriendly clients to work with.  The concern is that (despite the customer service given) this clientele was widely known to complain.  The result, with complaints from clients would come loss of job opportunity or likelihood of job separation.  Upon information and belief, Ms. Welsh knew these clients would complain and therefore gave these assignments to the Plaintiff with the knowledge that there would be strong likelihood of complaints.  This, of course, put Plaintiff's job status in jeopardy." <u>Id</u>.[1]  The Amended Complaint alleges only one instance where a client levied a complaint against the plaintiff, however, and it is not apparent that the particular client was African American or Hispanic.  <u>See id</u>. at ¶¶24-30 (concerning the

_____

[1]The plaintiff's allegations about this clientele's stereotypical proclivities to be difficult, complain, and be unfriendly, based solely on its race and ethnicity, are ironic in view of the plaintiff's claims of race discrimination.

event put on for client Kathy Cannon).  The plaintiff conspicuously does not allege that she in fact was subject to more client-initiated complaints because the events assigned to her were primarily for African American and/or Hispanic clients.

(7)     The plaintiff "readily volunteered to assist" in an upcoming event when another event manager resigned.  Id. at ¶19.  Ms. Welsh failed to warn the plaintiff that the client was unhappy with SMG.  Id. at ¶20.  The Amended Complaint does not indicate, however, that the client was other than fully satisfied with the plaintiff's performance once she became involved with the event.

(8)     Ms. Welsh "often discussed Plaintiff's wardrobe" and "would ask Plaintiff about the designer and ask where Plaintiff purchased such clothing, conveying to Plaintiff that she [Ms. Welsh] could not believe an African American woman like Plaintiff could own designer clothing."  Id. at ¶18.  The plaintiff fails to make specific factual allegations explaining what it was about Ms. Welsh's questions that caused the plaintiff to believe Ms. Welsh had drawn a racially derogatory conclusion, and there is no allegation that Ms. Welsh ever expressed such a view.

(9)     At an unspecified time, "Ms. Welsh commented to the previous Human Resources Director, 'can you believe she drives a Mercedes.'"  Id.

(10)     At an unspecified time, Ms. Welsh made the statement that "you can only get fired for not giving excellent customer service."  Id. at ¶21.  Although the plaintiff alleges that the statement was unexpected, id., she fails to allege how it is discriminatory.

(11)     On apparently the same occasion, Ms. Welsh is alleged to have told the plaintiff that "this is not a witch-hunt."  Id. at ¶22.  The plaintiff alleges that Ms. Welsh's comments

6

demonstrate that the plaintiff was "being set up to fail," without any factual explanation for the plaintiff's conclusion.

(12)     The plaintiff alleges that "on several occasions" Ms. Welsh disclosed the plaintiff's "medical condition" to clients, "which in turn made the clients not want to work with the Plaintiff."  Id.  The Amended Complaint does not contain allegations of the nature of the "medical condition," does not identify the clients who did not want to work with the plaintiff, and does not allege with any specificity the frequency of the alleged problem.

(13)     The plaintiff alleges that Ms. Welsh attempted to place the plaintiff in a "bad light" by reassigning her[2] "and couching it [as] as negative job performance," and that the plaintiff received "negative job performance evaluations" based on the reassignments, when co-workers who were not African American and "were reassigned as much as Plaintiff but those reassignments were not considered negative job performance. . . ."  Id. at ¶23.  These allegations, like many others, are conclusory and lack factual detail.  The plaintiff does not specify the instances, or even how often, she was reassigned; she does not describe the manner in which the reassignments were "couched" as a negative job performance or to whom; and she provides no details about the performance evaluations.  The non-African American co-workers who also were reassigned are not identified, and the particulars concerning the reassignments are not specified, nor is it alleged that the circumstances surrounding the reassignments were similar to those involving the plaintiff.

_____

[2]The meaning and significance of being "reassigned" is not clearly alleged.  Elsewhere in the Amended Complaint the plaintiff alleges that "[i]n all her time at SMG, she had never been taken off a show"prior to the Cannon event in April 2011.  Amended Complaint [Doc. # 13] at ¶28.

(14)     The Amended Complaint alleges that the plaintiff was assigned to work on an

event for Kathy Cannon.  Id. at ¶24.  Although Cannon is alleged to have been "unhappy for

reasons out of Plaintiff's control," after working with the plaintiff Cannon "was beginning to

trust SMG and was happier with the service she received from Plaintiff."  Id. at ¶25.  Ms. Welsh

continued to be involved in the project in connection with "issues that Plaintiff did not have the

authority to change."  Id.  The Amended Complaint also alleges:

> Two days before the show, Plaintiff was abruptly removed from
> the show without immediate explanation.  Specifically, on April
> 28, 2011, Assistant General Manager Lance Zanett and Ms. Welsh
> went to Plaintiff's office, closed the door, and began to berate and
> belittle the Plaintiff.  Mr. Zanett pointed his finger in Plaintiff's
> face and expressed his disappointment, accusing her of not
> providing exceptional customer service.  Mr. Zanett instructed
> Plaintiff to hand over the Cannon file to Ms. Welsh.  Plaintiff
> asked what complaints the client had made and Mr. Zanett angrily
> told her that Ms. Welsh would tell her when they met with Human
> Resources. . . .
>
> At that moment, Plaintiff understood that Ms. Welsh had
> purposefully developed a relationship with the client, making it
> easy and natural for the client to request Ms. Welsh to take over
> the event.

Id. at ¶¶26-27.  At a meeting with Human Resources on May 1, 2011, Ms. Welsh is alleged to

have said that the plaintiff was "taken off the show upon the client's request" because Cannon

did not like how the plaintiff delivered information, complained that the plaintiff did not speak

clearly, and had been embarrassed when the plaintiff "point[ed] out a mistake in a document."

Id. at ¶28.

(15)     The meeting with Human Resources on May 1, 2011, and a requested second

meeting scheduled to occur on May 3, 2011, were "the final straw."  Id. at ¶30.  As a result, "Ms.

Welsh had finally succeeded in making the work environment unbearable. . . .  Plaintiff had not

been feeling well due to the stress and hostile work environment. . . .  As a result of the hostile work environment and unpalatable working conditions, . . . Plaintiff's health was failing."  Id. The Amended Complaint is devoid of any details concerning the plaintiff's failing health.

> (16)   The Amended Complaint also alleges:
>
>> Of considerable note, earlier in 2011 Janelle Veres (a Caucasian co-worker) was taken off of an event based on a client request. When Ms. Veres was taken off the show, and unlike Plaintiff, there was not a fact-finding investigation nor were there accusations or drama.  Unlike Plaintiff, Ms. Veres was not belittled or berated. Ms. Veres was told immediately why the client requested she be taken off the show and reassigned to another event manager for 2012.  In contrast, SMG made Plaintiff wait in anticipation causing additional stress and anxiety.  Unlike Plaintiff, Ms. Veres was not African American.

Id. at ¶32.  No specifics of the Veres reassignment are alleged.

> (17)   On the issue of constructive discharge, the plaintiff alleges that after

approximately eight weeks of FMLA leave she was "[u]nable to return to work because of the hostile work environment" and "Plaintiff constructively discharged, effective August 1, 2011." Id. at ¶¶30-31.  However, the plaintiff alleges that before she "submitted her notice of constructive discharge and while she was on FMLA leave, Ms. Welsh immediately reassigned Plaintiff's events for the upcoming year and informed her staff that she would be posting for a position."  Id. at ¶34.  It is not alleged whether Ms. Welsh actually "posted" for a position, when she did it, and, if so, whether it was the plaintiff's position.

III.

A.  Discrimination Based on Race and Religion
Under Title VII and 42 U.S.C. §1981

"Title VII prohibits discrimination on the basis of race, color, religion, sex, and national

origin with respect to . . .  compensation, terms, conditions, or privileges of employment, and

discriminatory practices that would deprive any individual of employment opportunities or

otherwise adversely affect his status as an employee." Thompson v. North American Stainless,

LP, 131 S. Ct. 863, 868 (2011)(internal quotations omitted).  "Section 1981 forbids all

intentional racial discrimination in the making or enforcement of private or public contracts. . . .

In particular, § 1981 protects employees from racial discrimination both in entering into an

employment contract and in enjoying the benefits, privileges, terms and conditions of

employment." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004).

"A plaintiff may prove violation of Title VII or . . . § 1981--the standards are the same--

either by direct evidence of discrimination or by adhering to the burden-shifting framework of

McDonnell Douglas Corp. v. Green, [411 U.S. 792 (1973)]." Crow v. ADT Security Services,

Inc., 649 F. 3d 1189, 1194 (10th Cir. 2011) (internal citations omitted).  Direct evidence of

discrimination "demonstrates on its face that the employment decision was reached for

discriminatory reasons." Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1117 (10th Cir. 2007)

(internal quotation and citation omitted).  The plaintiff has not alleged facts demonstrating direct

evidence of discrimination.  Consequently, her Amended Complaint must be reviewed under

McDonnell Douglas.  "Under that rubric, the plaintiff must first establish a prima facie case of

discrimination or retaliation.  Then, the defendant may come forward with a legitimate, non-

discriminatory or non-retaliatory rationale for the adverse employment action.  If the defendant

does so, the plaintiff must show that the defendant's proffered rationale is pretextual." <u>Crowe</u>, 649 F.3d at 1195.

To state a prima facie claim of discrimination, a plaintiff must allege facts which plausibly suggest that "(1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination." <u>See</u> <u>Luster v. Vilsack</u>, 667 F.3d 1089.  Here, SMG attacks the Amended Complaint as failing plausibly to allege that the plaintiff suffered any adverse employment action.  Brief In Support [Doc. # 16] at p. 6.

In <u>Dick v. Phone Directories Co., Inc.</u>, 397 F.3d 1256, 1268 (10th Cir. 2005), the circuit court of appeals defined an adverse employment action as:

> . . . acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  In our recent decision of <u>Hillig v. Rumsfeld</u>, 381 F.3d 1028, 1033 (10th Cir. 2004), however, we expressly held that an adverse employment action is not limited to such acts.  Rather, we liberally interpret the second prong of the prima facie case and take a case-by-case approach, examining the unique factors relevant to the situation at hand.  Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action.

(Internal quotations and citations omitted except as indicated.)

The plaintiff asserts that she has alleged at least seven adverse employment actions taken against her by SMG.  For purposes of the Motion to Dismiss, I assume the truth of the factual allegations.

(1)      First, the plaintiff argues that SMG "made the schedule so that [the plaintiff] could not get any Sundays or Wednesdays off."  Response [Doc. # 19] at  p. 3. The plaintiff

11

alleges that initially she was allowed to take off Sundays and Wednesdays when possible. Amended Complaint [Doc. # 13] at ¶¶11-13.  However, the plaintiff alleges an incident where she "clarified" that "she did not put anyone but God on a pedestal," id. at ¶14, and that "after this conversation, . . . Ms. Welsh was not giving [the plaintiff] Sundays and Wednesdays off."  Id. at ¶13.

SMG criticizes paragraph 13 of the Amended Complaint as a "sham allegation," Brief In Support [Doc. # 16] at pp. 6-7, but it offers no authority under which I can do anything other than accept it as true.  However, I agree with SMG that "a scheduling dispute, without evidence of a material change in responsibilities or employment status, is not an adverse employment action." Brown v. Georgetown University Hospital Medstar Health, 828 F. Supp. 2d 1, 8 (D.D.C. Mar. 29, 2011).  Accord Kennedy v. General Motors Corp., 226 F. Supp. 2d 1257, 1268 (D. Kan. 2002)(holding that denial of vacation time and bereavement leave are mere inconveniences and, "[i]n the absence of . . . a tangible effect on plaintiff's employment," do not constitute an adverse employment action).

(2)     The plaintiff also alleges that she was assigned "the least desirable assignments, which assignments were known to create complaints."  Response [Doc. # 19] at  p. 3; Amended Complaint [Doc. # 13] at ¶17.  Abundant authority holds that "[t]he assignment of tasks that are within the description or duties of the position, even if less desirable, do not rise to the level of an adverse employment action."  Nidzon v. Konica Minolta Business Solutions, USA, Inc., 752 F. Supp. 2d 336, 350 (S.D.N.Y. 2010).  Accord Morales-Vallellanes v. Potter, 605 F.3d 27, 38 (1st Cir. 2010); White v. Hall, 389 Fed. Appx. 956 **2-3 (11th Cir. July 29, 2010); Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004); Figueroa v. New York City Health and Hospitals

<u>Corp.</u>, 2007 WL 2274253 *4 (S.D.N.Y. Aug. 7, 2007).

(3)     The plaintiff alleges that SMG disclosed the plaintiff's "medical condition to clients, thereby making clients not want to work with [her]."  Response [Doc. # 19] at  p. 3; Amended Complaint [Doc. # 13] at ¶22.  The plaintiff acknowledges that she is not making a claim under the Health Insurance Portability and Accountability Act ("HIPAA").  Response [Doc. # 19] at p. 3 n.2.  In addition, an adverse employment action is one that constitutes a significant change in employment status, <u>Dick</u>, 397 F.3d at 1268, and the indiscrete disclosure of an employee's personal information under the facts alleged here does not satisfy that requirement.  <u>See</u> <u>Griffin</u>, 356 F.3d at 829 (listing employee complaints and finding that none of them significantly altered the terms and conditions of the employee's job sufficiently to constitute an adverse employment action). In particular, while the Amended Complaint alleges that disclosure of the medical information "made the clients not want to work with the Plaintiff," Amended Complaint [Doc. # 13] at ¶22, there is no allegation that any client refused to work with the plaintiff on this basis or that the plaintiff was removed from a project for this reason. To the contrary, the plaintiff alleges that  "[i]n all her time at SMG, she had never been taken off a show"prior to the Cannon event in April 2011.  Amended Complaint [Doc. # 13] at ¶28.

(4)     The plaintiff alleges that she suffered an adverse employment action when Ms. Welsh gave her "negative job performance evaluations."  Response [Doc. # 19] at  p. 3; Amended Complaint [Doc. # 13] at ¶23.  The allegation that the plaintiff received negative evaluations, without more, does not constitute an adverse employment action.  <u>EEOC v. PVNF, L.L.C.</u>, 487 F.3d 790, 800 (10th Cir. 2007) (stating that "a written warning is an adverse employment action only if it effects a significant change in the plaintiff's employment status" by,

13

for example, "affecting the likelihood that the plaintiff will be terminated, undermining the plaintiff's current position, or affecting the plaintiff's future employment opportunities"). Accord Johnson v. E.A. Miller, Inc., 172 F.3d 62 *2 (10th Cir. 1999) (holding that a meeting with management in which the plaintiff receives a reprimand is not an adverse employment action); Kennedy, 226 F. Supp. 2d at 1268 (a written warning with no further effect on the employment status is not an adverse employment action); Rattigan v. Gonzales, 503 F. Supp. 2d 56, 73 (D.D.C. 2007) (noting that "performance evaluations . . . generally do not rise to the level of an adverse employment action because . . . [they] may be outweighed by later evaluations and be of no real consequence").  The plaintiff has failed to allege any effect on her employment status as a result of the negative evaluations.

(5)     The plaintiff alleges an adverse employment action as a result of being "abruptly stripped from her job duties . . . based on false accusations, belittled by management and subjected to a fact-finding investigation."  Response [Doc. # 19] at  p. 3; Amended Complaint [Doc. # 13] at ¶26.  Here, as in the case of the negative evaluations, a meeting with management in which the plaintiff receives a reprimand, without more, is not an adverse employment action. EEOC , 487 F.3d at 800; Johnson, 172 F.3d 62 at *2 (10th Cir. 1999); Kennedy, 226 F. Supp. 2d at 1268.

(6)     The plaintiff argues that she suffered an adverse employment action by being treated differently from a Caucasian employee who was "removed from a job duty similar to [the plaintiff]."  Response [Doc. # 19] at pp. 3-4.  According to the plaintiff, the Caucasian employee "was not subjected to the same treatment that [the plaintiff] was subjected to."  Id. at p. 4.

The allegations of the Amended Complaint fail to state that the circumstances of the

removal of the two employees were similar, however, and alleges only:

> [E]arlier in 2011 Janelle Veres (a Caucasian co-worker) was taken off of an event based on a client request. When Ms. Veres was taken off the show, and unlike Plaintiff, there was not a fact-finding investigation nor were there accusations or drama. Unlike Plaintiff, Ms. Veres was not belittled or berated. Ms. Veres was told immediately why the client requested why she be taken off the show and reassigned to another event manager for 2012. In contrast, SMG made Plaintiff wait in anticipation causing additional stress and anxiety. Unlike Plaintiff, Ms. Veres was not African American.

Amended Complaint [Doc. # 13] at ¶32. However, in order for the plaintiff to show that she was treated less favorably than another similarly situated employee not in a protected class, she must allege that she and Ms. Veres are similarly situated. Our circuit court has explained that "[i]ndividuals are considered 'similarly situated' when they deal with the same supervisor, are subjected to the same standards governing performance and discipline, **and have engaged in conduct of comparable seriousness**." EEOC, 487 F.3d at 801 (internal quotation and citation omitted) (emphasis added). The plaintiff has failed to allege facts sufficient to state a plausible claim that she and Ms. Veres were similarly situated because, in particular, she fails to allege anything about the nature of the conduct leading to Ms. Veres being "taken off the show." Amended Complaint [Doc. # 13] at ¶32.

(7)     Finally, the plaintiff argues in a purely conclusory fashion that she suffered an adverse employment action by being constructively discharged effective August 1, 2011. Response [Doc. # 19] at p. 2. The allegations of the Amended Complaint provide more meat:

> Plaintiff was very distraught after [the meeting with Human Resources on May 1, 2011]. Following the conversation, Plaintiff felt like the environment had become too much and Ms. Welsh had finally succeeded in making the work environment unbearable. Plaintiff's health began to fail due to stress. On Tuesday, May 3,

> 2011, Plaintiff received a call from Ms. Strong asking her to meet
> with the Plaintiff.  That was the final straw, Plaintiff had not been
> feeling well due to the stress and hostile work environment.
> Plaintiff informed Ms. Strong that she was not feeling well.
> Plaintiff went out on FMLA leave for personal health reasons.  As
> a result of the hostile work environment and unpalatable working
> conditions caused by Ms. Welsh, Plaintiff's health was failing.
>
> Unable to return to work because of the hostile work environment,
> Plaintiff constructively discharged, effective August 1, 2011.

Amended Complaint [Doc. # 13] at ¶¶30-31.

> The circuit court of appeals has defined a constructive discharge as follows:

> > A constructive discharge occurs when an employer, through
> > unlawful acts, makes working conditions so intolerable that a
> > reasonable person in the employee's position would feel forced to
> > resign.  Working conditions must be so severe that the plaintiff
> > simply had no choice but to quit.  In contrast, a plaintiff who
> > voluntarily resigns cannot claim that he or she was constructively
> > discharged.
> >
> > The question is not whether working conditions at the facility were
> > difficult or unpleasant. . . .  We judge the voluntariness of an
> > employee's resignation under an objective standard, looking to
> > whether his or her working conditions were so intolerable that a
> > reasonable employee would have had no other choice but to quit.

Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135-36 (10th Cir. 2004).  In addition, "the fact that a plaintiff subjectively considers his or her workplace stressful and may have suffered personal health problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign."  Id. at 1136 n.7.

Accepting all of the plaintiff's factual allegations as true, I find that they do not even approach conditions sufficient to find that the plaintiff's resignation was objectively involuntary.

The plaintiff has failed to allege facts plausibly demonstrating that she suffered an adverse employment action.

16

B.  Hostile Work Environment

The plaintiff also fails to plead facts sufficient to state a plausible claim for harassment based on a hostile work environment.  A hostile work environment is defined as a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  <u>MacKenzie v. City and County of Denver</u>, 414 F.3d 1266, 1280 (10th Cir. 2005) (quoting <u>Penry v. Fed. Home Loan of Topeka</u>, 155 F.3d 1257, 1261 (10th Cir. 1998).  Factors tending to show a hostile work environment are measured in the following terms: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance."  <u>MacKenzie</u>, 414 F.3d at 1280.  "[C]ourts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of . . . jokes, and occasional teasing" as well as "offhand comments, and isolated incidents (unless extremely serious)."  <u>Id</u>.  Federal discrimination laws are not to "become trivialized as a civility code."  <u>Id</u>.

Here, the plaintiff alleges:

(1)     "On one occasion" Ms. Welsh snapped when the plaintiff requested a Sunday off, Amended Complaint [Doc. # 13] at ¶13;

(2)     "On a separate occasion" the plaintiff and Ms. Welsh had a disagreement about the expression to put a client "on a pedestal," resulting in Ms. Welsh "mocking" the plaintiff's religious beliefs and stating in an isolated incident that she "did not like the fact that Plaintiff practiced her religious beliefs," <u>id</u>. at ¶¶14-15;

17

(3)     "[E]arly in [the plaintiff's] employment," and apparently on a single occasion,

"Ms. Welsh bluntly questioned Plaintiff about her ethnicity," id. at ¶17;

(4)     Ms. Welsh "often discussed Plaintiff's wardrobe" and "would ask Plaintiff about

the designer and ask where Plaintiff purchased such clothing," id. at ¶18;

(5)     In an apparently isolated incident, "Ms. Welsh commented to the previous Human

Resources Director, 'can you believe she drives a Mercedes,'" id.;

(6)     At an unspecified time and in an apparently isolated incident, Ms. Welsh stated

"you can only get fired for not giving excellent customer service" and "this is not a witch-hunt,"

id. at ¶¶21-22;

(7)     "[O]n several occasions" Ms. Welsh disclosed the plaintiff's medical condition to

clients, id. at ¶22;

(8)     On unspecified occasions, Ms. Welch "couched" reassignments of the plaintiff

"as negative job performance," id. at ¶23;

(9)     On April 28, 2011, "Assistant General Manager Lance Zanett and Ms. Welsh

went to Plaintiff's office, closed the door, and began to berate and belittle the Plaintiff.  Mr.

Zanett pointed his finger in Plaintiff's face and expressed his disappointment, accusing her of not

providing exceptional customer service.  Mr. Zanett instructed Plaintiff to hand over the Cannon

file to Ms. Welsh.  Plaintiff asked what complaints the client had made and Mr. Zanett angrily

told her that Ms. Welsh would tell her when they met with Human Resources," id. at ¶26;

(10)     At a meeting with Human Resources on May 1, 2011, Ms. Welsh said that the

plaintiff was "taken off the [Cannon] show upon the client's request" because Cannon did not

like how the plaintiff delivered information, complained that the plaintiff did not speak clearly,

and had been embarrassed when the plaintiff "point[ed] out a mistake in a document," id. at ¶28; and

(11)    The plaintiff was requested to attend a meeting at the Human Resources department on May 3, 2011. Id. at ¶30.

The plaintiff was employed at SMG for more than six years, from May 2005 to August 2011.  Most of the incidents alleged by the plaintiff as constituting a hostile work environment-- e.g., discussing the plaintiff's wardrobe and an isolated statement concerning her car; statements about excellent customer service; negative job evaluations; and performance reviews discussing client concerns--certainly do not.  Others--e.g., "snapping" at the plaintiff "[o]n one occasion"; a single expression that her supervisor "did not like the fact that Plaintiff practiced her religious beliefs"; a single inquiry about the plaintiff's ethnicity; and disclosure of the plaintiff's medical condition to "several" clients--are sporadic, isolated incidents and ordinary tribulations of the workplace, which individually and collectively do not rise to the level of a hostile work environment.  The conditions alleged by the plaintiff, accepted as true, do not approach a workplace "permeated with discriminatory intimidation, ridicule, and insult. . . ." MacKenzie, 414 F.3d at 1280.

## C.  Wrongful/Constructive Discharge

The plaintiff concedes, "[i]n light of the arguments presented," that she has failed adequately to allege a claim for wrongful discharge and states that she "shall dismiss that claim with prejudice," Response [Doc. # 19] at p. 13, although she has not done so.

As stated above, supra at pp. 15-17, the plaintiff also has failed adequately to allege facts plausibly demonstrating that she was constructively discharged from her employment.

IV.

I respectfully RECOMMEND that the Motion to Dismiss [Doc. # 15] be GRANTED.[3]

Dated January 10, 2014.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge

---

[3]Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.   A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  Makin v. Colorado Dept. of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).